SAFETY CAR HEATING & LIGHTING CO. v. GOULD COUPLER CO.

(Circuit Court of Appeals, Third Circuit. February 7, 1920. Rehearing Denied May 11, 1920.)

No. 2472.

PATENTS ⬤⟿328—FOR ELECTRICAL SYSTEM OF CAR LIGHTING VALID, BUT NOT INFRINGED.

    The Jepson patent, No. 1,179,373, for an electrical system of distribution, particularly adapted for use in railroad passenger cars, *held* valid, but not infringed.

Appeal from the District Court of the United States for the District of New Jersey; Thomas G. Haight, Judge.

Suit in equity by the Gould Coupler Company against the Safety Car Heating & Lighting Company. Decree for complainant, and defendant appeals. Affirmed on issue of validity of patent, and reversed on issue of infringement.

Randolph Parmly, of Jersey City, N. J., and Joseph C. Fraley, of Philadelphia, Pa. (Livingston Gifford and Robert S. Blair, both of New York City, of counsel), for appellant.

Kenyon & Kenyon, of New York City (Richard Eyre, Wm. Houston Kenyon, and Newton A. Burgess, all of New York City, of counsel), for appellee.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before BUFFINGTON and WOOLLEY, Circuit Judges, and RELLSTAB, District Judge.

WOOLLEY, Circuit Judge. The defendant appeals from a decree holding valid and infringed claims 16, 30, 45, 56, 57 and 58 of Letters Patent No. 1,179,373 issued April 11, 1916, to J. W. Jepson.

The patent relates to "Improvements in Electrical Systems of Distribution" particularly adapted for use in passenger railroad cars, where the power by which electricity is generated is derived from the car axles. The invention consists in employing in a system, otherwise old, a particular type of regulation, having a precisely defined electrical action, and having, in its embodiment, a well defined mechanical structure, in place of other regulating devices, which long have been and still are used in similar relations for the same purpose. The problem of the art, to which the invention is directed, stated briefly, is the regulation of the electric generator in a way to make its voltage and current constant under variable speed changes of the car, and, at the same time, responsive, by change in output, to the varying needs of the system. In solving this problem, the object of the invention—stated with more particularity, yet with no attempt to review in this opinion the elaborate and discursive consideration of the science of electricity by the experts—is so to regulate the generator as to make it responsive to the needs of the storage battery by cutting down the current as the battery becomes charged, and to make it maintain the supply of electricity constant under changing speeds to meet the variable demands of the service. The subject matter thus involved is the electrical coordination and cooperation of many pieces of electrical apparatus under various changing conditions of generator speed, state of battery charge, lamp-load, etc.

This problem, in so far as it has been met by the art, has been solved by resort in different ways to the well known variations in the magnetic field of a current solenoid, occasioned by an increase or decrease of current, and to like variations in the magnetic field of a voltage solenoid, occasioned similarly by an increase or decrease of voltage, and by employing these variations to raise and lower the energy of the magnetic field of the generator, and thereby regulate the current flow in the system. Regulation of the magnetic field of the generator is achieved by weakening or strengthening the current which flows through it. This change in current is effected by a device which provides variable resistance to the current flowing to the field coil. Such device in this art consists ordinarily of a pile of carbon discs placed flatwise side by side through which the current is forced to travel. The resistance of this pile is great or less according as the discs are pressed tightly together or are loosely released. The compression or relief of the carbon pile (and, in consequence, the strengthening or weakening of the current flow to the magnetic field of the generator) is brought about by mechanical connections of different sorts, such, for instance, as a bell-crank lever urged in one direction by a spring to compress the pile and in the opposite direction by the core of a cur-

rent solenoid (or current coil), or the core of a voltage solenoid (or voltage coil), or the cores of both, acting as magnets within their respective fields to oppose the spring and relieve the pile of pressure.

Regulation of such a system as this covers two stages; one, when the battery is being charged; the other, after the battery has been charged; known respectively as the charging and charged stage. Such regulation has for its one object constancy of current and voltage throughout both stages with a capacity of responding immediately to the demands of the system. Unstable current means inconstancy in lighting; and, inconstancy in voltage would, when violent, destroy the battery. To preserve constancy against the inherent disturbing ele-- ments in such a system, the art, prior to the patent in suit, had developed many generators which the learned trial judge has, with an accuracy quite sufficient for this discussion, classified as follows:

(1) Current regulation, that is, regulation by a current coil alone;

(2) Voltage regulation, that is, regulation by a voltage coil alone;

Regulators in neither of these classes were satisfactory. Current regulation alone had the disadvantage of failing to protect the storage battery against overcharge; and voltage regulation alone was unsatisfactory because it is less responsive to changes in generator output than current regulation. To overcome these disadvantages, the art developed regulators with both coils in combination; as

(3) A voltage coil used in connection with a current coil, for the purpose of cutting down the current below the standard for which it had been set in order to protect the storage battery from overcharge; and

(4) A current coil used in connection with a voltage coil, to modify the rate of charge for which the regulator had been originally set.

From this it will be seen, that when Jepson surveyed the field of generator regulators, he found in it a well defined line of invention, comprising, at least, the four classes described. But Jepsen discovered a breach in this line. On one flank there were two current regulators, one with a single current coil and the other with a current coil assisted by a voltage coil. On the other flank there were two voltage regulators, one with a single voltage coil and the other with a voltage coil assisted by a current coil. There was nothing between these two well marked groups of invention. The breach was not a wide one, to be sure; but it was there. Into this breach Jepson entered with the invention of the patent in suit, showing a generator regulator of an entirely new type, comprising two coils, one current and the other voltage, both old, but in whose operation one superseded the other, each acted independently of and without effect on the other, and neither rendered assistance to the other. In advancing straight between these flanks and taking up a place in the breach as the place of his invention, Jepson was careful to frame the most of the claims of his patent application in language which made it clear that in preempting for his invention the place left open in the line of this art, he impinged on no invention on either flank; and where in some claims he had not made altogether clear the particular place in the art which he claimed for

his invention, he readily acquiesced in the demand of the Patent Office that he make it unmistakably certain by appropriate language.

The claims of the patent, being fifty-eight in number, are both broad and narrow. The broad claims define the means for regulating the generator solely by the electric functioning of the current coil and voltage coil; the narrower claims include various pieces of electrical apparatus by which such functioning is effected. We are concerned in this action only with the broad claims, of which the following is typical:

"56. The combination of a variable speed generator, a battery connected thereto, a current coil affecting the regulation of the generator during speed changes while the battery is below a certain state of charge, and a voltage coil independently thereof effecting said regulation when the battery is above a given state of charge, said current coil being then *without effect* upon the generator regulation."

The principle of the invention, which distinguishes it from all others, has been well expressed by the plaintiff in one sentence, as "voltage regulation superseding current regulation."

For the embodiment of this principle, the patentee has—as stated by the learned trial judge—

"provided a current coil responsive to current changes due to speed changes, wound on a core, which acts in turn, through levers, on a carbon pile (variable resistance) in circuit with the generator field coil. He also provided a voltage coil responsive to voltage changes, mounted on a separate core, which, likewise, through levers, acts on the carbon pile. The levers were designed to compress or open the discs comprising the carbon pile, and thus to vary the strength of the field coil and hold the generator output constant. This voltage coil, however, was not designed to and does not come into operation until the back voltage of the batteries has forced the voltage of the system up to the predetermined standard, beyond which it is not desired that it shall rise. When it has reached this point, then the voltage coil through its core and levers acts upon the carbon pile, and, through the field coil, cuts the current down so that the current regulator thereafter has no regulating effect, until, of course, the batteries have become so discharged as to again permit current regulation to take effect. The result is that in the Jepson invention, *there is first current regulation superseded by voltage regulation, and when the latter takes place the former has no effect on the system.*"

Independence of regulation, first by current and then by voltage, and the entire absence of any regulation of a kind that does not involve independent and superseding action of the regulating coils, constitute the principle of the invention. There is never joint regulation. One coil acts at a time. When one acts, the other is at rest; neither starts until the other stops. The presence of a mechanical stop for each coil in the plaintiff's commercial embodiment of the invention makes coil action impossible in any way other than independent and abruptly successive.

On the issue of validity, it is sufficient to say, that we find nothing in the art involving this precise principle. The defendant's references given in evidence to prove anticipation or to show a state of the art that negatives invention are distinguishable from the invention of the patent. For several reasons given by the learned trial judge, as well as for others of our own, we concur with him that the claims of the

patent in suit, as limited by their own terms, involve invention, and are, therefore, valid.

When Jepson found an opening in the art and entered that opening with his invention without encroaching on what was on either side, it did not follow that he found the only place in the art not occupied, or that his invention was so broad that it covered the art and closed it to all others. Every one was free thereafter to explore the field and to take any place not preempted by him or by others. And this is just what the defendant claims that it has done.

The apparatus of the defendant has many points of resemblance to the generator regulator of the patent. It is used in the same kind of system; it is intended to solve the same problems; it resorts to the same forces; its operation is affected by the same variable factors; and it is intended to produce, in varying degrees, perhaps, the same results. Like the embodiment of the Jepson invention, it comprises the old elements of two coils, a current coil and a voltage coil, whose cores are connected by levers with a carbon pile through the variable resistance of · which, according as the carbon discs are compressed or released, the flow of current to the magnetic field of the generator is increased or diminished, and the current flow to the system is regulated and controlled.

Between the contesting devices, there are, however, points of difference, found in the relation which the coil levers bear to· one another, and in the manner in which they function under the impelling magnetic force of their respective coils.

In the invention of Jepson, as we have seen, the two coils supersede one another in regulating the system. One coil acts at a time; the two never act together. There is no interdependence of coils; nor is there coil co-action in the sense that one coil assists the other, or in the sense that one does anything at the time the other is doing something. In fact, by the mechanical arrangement of stops, joint action, co-action, or simultaneous action of the two coils is made impossible.

In the defendant's structure, if the regulation begins with the battery wholly discharged, the initial action is for a moment, perhaps, that of the current coil alone, but as the charging stage progresses, there is dependence in action by one coil on the other; assistance rendered by one to the other; and co-action of the two through contact of their levers in producing the one result, namely; the regulation of the generator field coil. When the battery is fully charged, the second stage begins. Then the voltage coil either acts alone, or the current coil co-acts with it, not through its lever as before, but through the medium of a claimed magnetic interaction. Wherefore, the defendant claims, that while it escapes infringement by this difference in coil action during the charging stage of the battery, yet, throughout both stages the two coils co-act.

Further contrasting the two devices, it appears that in the invention of the patent there are two controls, current and voltage. One supersedes the other; change from one to the other is abrupt and complete. The voltage coil never comes into action until the back voltage of the

battery has forced the voltage of the system up to a predetermined standard.

In the defendant's device there are at least two controls, composite and voltage—composite being made up of both current and voltage; pure voltage supersedes composite; change from one to the other is not abrupt; it is relatively gradual. The voltage coil never waits until the battery has been charged to its predetermined limit, but joins with the current control as the voltage backs up, and thus the two shade into composite control. Out of composite control, pure voltage control emerges as current fades away.

The same distinctions persist in the reversal of the action.

In Jepson, the carbon pile, through whose variable resistance the field coil is regulated, has no base of its own. Its discs are movable, by release or compression, toward both ends. Each lever, however, when inactive on its stop, becomes in turn the base of the carbon pile against which the other lever, when active, operates to compress or release its discs.

In the defendant's apparatus, the carbon pile has a base of its own, against which, movement of its discs is stopped at that end. Release or compression is effected only from the other end, and is effected directly by contact with the voltage lever, and indirectly by contact with the current lever.

The mechanical embodiment of Jepson, therefore, permits action on the carbon pile only by one lever at a time; and that action always is direct. Mechanism in the defendant's device permits action on the carbon pile by one or by both levers at a time, directly and indirectly,—directly by the voltage lever when acting alone; directly by the voltage lever and indirectly by the current lever when acting together.

With these contrasts in mind, and remembering always that the principle of the invention is "voltage regulation superseding current regulation," we shall discuss the issue of infringement in a way, which, doubtless, will convict us of repetition, yet in a way we find necessary because of the mysteries of electricity and the elusive quality of its elements.

The coil levers in Jepson are so positioned as never to come in contact. Oppositely, the coil levers in the defendant's device are so positioned as to come in contact at any time throughout the charging stage. After the charging stage, that is, after the battery has been charged to a predetermined limit, the voltage lever,—its point of contact with the current lever being positioned above the latter,—rises above or moves away from the current lever, as the voltage increases and the current correspondingly decreases. Thereafter, the voltage lever acts alone, until a change in the system again brings the two levers into co-action, when assistance by one lever is again rendered the other in compressing and releasing the carbon discs, and, consequently, in regulating the energy of the field coil, and through it controlling the current of the system.

The defendant says this is old, the principle being found, it claims, in the application of Creveling, filed May 28, 1908, on which the Crev-

eling patent No. 920,827 (now owned by defendant) and the divisional Creveling patent No. 1,251,479 were issued; being found also in Schlesinger patent No. 331,552 and in Fulton's device, and, of course, in Bijur, No. 1,241,908,—the patent under which the defendant builds its apparatus.

As we have sustained the validity of the Jepson patent on the issue of invention, we are not influenced by the opposite positions which the defendant has taken with reference to the Creveling invention, when prosecuting suits for infringement; nor are we required to review the dispute as to whether Creveling is a part of the prior art. This, for the reason that Creveling was cited against Jepson by the Patent Office and Jepson amended his claims to avoid Creveling in order to get his patent. Obviously, then, if Jepson has avoided Creveling, and the defendant has followed Creveling, the defendant has avoided Jepson.

Creveling patent No. 920,827, which deals with the charged stage of the battery, shows by positive expression and diagram the two coils, voltage and current, and shows also both coils at work at the same time, the lever of the voltage coil assisting the lever of the current coil to increase resistance and cut down the output of the generator. This co-action of the two levers, involving assistance by one to the other, is not only shown by the patent, but is conceded by the plaintiff's experts. The divisional Creveling patent No. 1,251,- 479 deals with the charging stage in which one lever assists the other during that stage.

We see in the co-action of the coils and of the coil levers in the early Creveling patent—wholly aside from its lamp regulating means —the beginning of the principle on which the defendant's apparatus was developed, and we cannot, therefore, regard that patent as a mere "paper patent."

Neither can we disregard the place in the art which both the patentee and the Patent Office conceded to Creveling at the time Jepson's application was pending. The most of Jepson's claims were so framed as clearly to escape the co-action of the Creveling coils. This Jepson had to do to get a patent. But in two or three claims (claim 16 in suit being one) the language lacked Jepson's usual precision of expression, and in defining the effect of the independent coil action of the invention, he said, that the "first mentioned (current) coil having *substantially* no effect on the apparatus when the second mentioned (voltage) coil is operating, and said second mentioned coil having *substantially* no effect on said apparatus when said first mentioned coil is operating." These claims, because of the use of the word "substantially," were rejected on Creveling, and they were rejected because the principle of Jepson's invention, as understood by himself on his own disclosure in other claims and as understood by the Patent Office, involved an operation in which one coil when at rest had "no" effect whatever on the generator regulation when the other coil was in action. The significance which we give to the action of the Patent Office in rejecting claims on Creveling because of the

use of the words "having *substantially* no effect"—words which would bring Jepson within Creveling—is no greater than and is no different from the interpretation and limitation which Jepson himself gave his invention by his own very precise language in other claims.

The Fulton regulator, built after but departing somewhat from the principle of the McElory patent, No. 893,534, shows both current and voltage coils with their cores pivotly connected to a miniature walking-beam. This beam rises and falls in response to the movement of both coil magnets, and in its rise and fall controls the generator. In this movement the current coil may for a time be dominant, according to the charge of the battery, though both coils appear to act in different degrees throughout both stages of the battery charge. Whether or not this is precisely correct, it is certain that as the battery charges and voltage backs up, the two coils work together, the voltage coil assisting the current coil. Whether later the voltage coil dominates, the fact is that in Fulton the voltage coil *for a time* assists the current coil in responding to the varying demands of the system.

Disregarding the Schlesinger patent, No. 331,552, as being in a different art with different problems, we are satisfied that the principle of co-action of the two coils as distinguished from the independent coil action of the patent appears in different degrees in Creveling and Fulton, and that this is the principle of the coil action in the defendant's device, though employed by it in an improved manner and in a greater degree. If the kind of action in the defendant's device is the same as that found in the art, we are not concerned with differences in the degree in which it is exerted. To get his patent, Jepson had to say to the Patent Office that the coil action of his invention was not Creveling's kind; we think the defendant's coil action is the same kind as Creveling's, though applied at a different stage of the battery charge.

Thus it appears that the issue of infringement turns on the action of the current coil and voltage coil of the two structures during the operation of the generator. In the Jepson regulator—as we must say still again to keep the contrast constantly in view—the coils act independently of each other, their levers never coming in contact with and never rendering assistance to one another. In the defendant's structure (assuming that the battery is at the beginning not charged at all), the current coil is the first regulating coil to come into action. The lever of the current coil, engaging the voltage lever on its under side, causes the voltage lever to rise with it. In a part of this rise—certainly for a brief period at the very beginning—the regulation may be entirely that of the current coil. Its lever action is then being exerted against the double spring power of both levers. As time goes on, however, and the charge of the battery increases, the voltage rises and backs up against the voltage coil. As the voltage rises, it gradually increases the strength of the voltage coil. In doing so, it brings the voltage coil more and more into action; the opposition of the voltage lever to its own spring increases; and the voltage pull is transmitted more and more to the carbon pile. As the predetermined

limit of the battery charge is approached and is finally reached, the force of the current coil progressively weakens and the pull of its lever correspondingly lessens in value. Manifestly, through all these changes, there is composite action of the two coils exerted through their levers. The pull of one may be, and, doubtless is, at all times different from the pull of the other; but in their varied pulls each adds something to the joint pull. In their composite action, a gradual readjustment of current and voltage forces is effected to maintain constancy against speed disturbances and against injury to the battery from overcharge. These readjustments are automatic; they change in force repeatedly; and finally end when the gradually rising voltage and the correspondingly diminishing current cause the two levers to move out of engagement. Thereafter, the voltage coil, being strong enough alone to control the resistance of the carbon pile, acts alone, until, under the always changing conditions of the system, the voltage decreases on the discharge of the battery and the current correspondingly increases, and the two levers again come in contact and the coils again renew their co-action and pursue their automatic readjustments. This is voltage regulation superseding composite regulation, and composite superseding voltage.

The plaintiff does not seriously contest that this is the coil action of the defendant's apparatus; but it contends, and the learned trial judge has found, that in this co-action of coils in the defendant's structure, the assistance given by the voltage coil to the current coil is so slight as to be negligible in effecting the regulation of the generator. This is in effect a finding that the assistance which one coil gives the other, though actual, is of no operative value. This, finally, is the precise point on which we think the case turns, and on which we find ourselves at variance with the learned trial judge.

If, during the time the levers are in contact, the assistance which one coil gives the other is not functional, then, certainly, there is in the defendant's structure what the plaintiff claims, namely; one coil action superseding the other. This is Jepson. And so thought the learned trial judge. We think the assistance which the voltage coil renders the current coil, during the period of their co-action, is functionally operative through its lever on the carbon pile, and therefore, is functionally operative in the control of the system, measured by tests and evidence, which—again differing with the learned trial judge —we regard as preponderating; and that this assistance is not negligible, but is, for a time, substantial. If this be so, the defendant's structure does not infringe Jepson, for in Jepson there is no assistance given by one coil to the other for any period of time.

Having already found that between the two devices there is a difference in kind of coil action during the charging stage, we are not concerned with the degree of assistance which one coil renders the other in the defendant's kind of coil action, if that difference is not negligible, and if, also, it is not employed as a mere device to escape the superseding action of the Jepson coils. If, on the other hand, it is substantial in the sense of performing a real function, the distinction between the

defendant's device and Jepson broadly appears. Whether the voltage coil in the joint regulation of the defendant's device performs one-tenth, one-fourth, or one-half of the joint work of regulation is a matter of degree, and is, therefore, a matter of no present concern. The matter which here concerns us is whether it does perform a real, not a simulated, part of the joint work of control, during the charging stage. We think it performs a real part; and in expressing this view we shall not, in this opinion, review or attempt to reconcile the great volume of hopelessly conflicting testimony of the experts.

Further defending the charge of infringement, the defendant maintains that composite coil action in its device is not limited to the charging stage alone, but is found in the charged stage also, due to a claimed magnetic interaction between the two coils. As we are of opinion that the defendant has shown in its structure a composite coil regulation during the charging stage, which undergoes gradual readjustment in its transition to single coil regulation, that is, voltage regulation superseding *composite* regulation, as distinguished from "voltage regulation superseding *current* regulation" of the patent, it follows, on this showing alone, that the defendant must prevail on the issue of infringement. This being so, it is unnecessary to discuss or decide, whether, during the charged stage, there is in the defendant's device a composite action arising from magnetic interaction of the coils.

The decree below is affirmed on the issue of validity and reversed on the issue of infringement, with costs for the appellant.